THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | |
|---|---|
| ELI HERNANDEZ | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 26-CV-85 |
| | ) |
| JAPAN TOBACCO INTERNATIONAL U.S.A., INC. | ) |
| d/b/a JT International U.S.A., Inc. | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff, ELI HERNANDEZ, complains of Defendant, JAPAN TOBACCO INTERNATIONAL U.S.A., INC. d/b/a JT International U.S.A., Inc., and for claims shows the Court as follows:

**I. Introductory Statement**

1. The Plaintiff, ELI HERNANDEZ, alleges he was discharged and otherwise discriminated and retaliated against by his employer, the Defendant, in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994, "USERRA", 38 U.S.C. §4311.

**II. Parties**

2. Plaintiff, ELI HERNANDEZ, is a citizen of the United States and a resident of El Paso County, Texas.

3. Defendant, JAPAN TOBACCO INTERNATIONAL U.S.A., INC. d/b/a JT International, Inc., is a corporation that is incorporated under the laws of the State of California. It has its principal places of business in Teaneck, New Jersey and Raleigh, North Carolina. Its

registered agent for service of process is Corporation Service Company d/b/a CSC - Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218 USA. Defendant may be served with process by serving its registered agent.

### III. Jurisdiction

4. The Court has jurisdiction over the lawsuit because the actions arise under the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §4311 and §4323(b)(3).

### IV. Venue

5. Venue is proper in the Western District of Texas because Defendant maintains a place of business in El Paso, Texas. 38 U.S.C . §4323(c)(2).

### V. Statements of Claims

6. The allegations of paragraphs 1 through 5 of this Complaint are incorporated by reference into this paragraph.

7. At all times relevant to this lawsuit Defendant's employees, agents, and servants acted in the course and scope of their employment with Defendant.

8. Mr. Hernandez is a soldier, a member of the United States Army National Guard. At all times relevant to this lawsuit he has been a Staff Sergeant in the New Mexico National Guard's 1st Battalion, 200th Infantry (Light).

9. The United States Army National Guard has different training requirements depending on whether a soldier is deployed to active duty or not deployed. If not deployed to active duty, soldiers can be ordered to attend 1) Weekend Drills, on average one weekend per month, or from one to four days for each weekend drill, 2) Annual Training of about two weeks each year, and 3) Additional training based on anticipated mission needs. If deployed to active duty, soldiers can be

ordered to attend 1) Pre-Deployment Training that can last weeks to months as necessary depending on the mission, and 2) Active Duty Training that is continuous while deployed to maintain readiness.

10. Mr. Hernandez responded to an online advertisement that was soliciting employment for sales positions with Defendant in specified markets. When he interviewed for a position, he was told of job openings in Corpus Christi, Texas and El Paso, Texas, and that if he did not live in the sales district he would have to move to reside within the district.

11. On or about February 12, 2024, Defendant hired Mr. Hernandez as an at-will employee to work in the sales position of Business Advisor for its El Paso territory that includes parts of West Texas and Southern New Mexico. He worked for Defendant until his discharge on February 28, 2025.

12. Defendant provided Mr. Hernandez with a company cell phone, a company lap top computer, a company credit card, and a leased vehicle. Defendant had packages delivered to his home with point-of-sale (P.O.S.) materials that included stickers, posters, flyers, and displays for Defendant's tobacco products. Defendant told Mr. Hernandez to rent a storage unit for the P.O.S. materials and to pay for it with the company's credit card. Mr. Hernandez rented a storage room for Defendant at ExtraSpace Storage and paid for it with that credit card. Mr. Hernandez stored Defendant's P.O.S. materials in the storage unit during his employment.

13. Mr. Hernandez's work for Defendant consisted of communicating with his supervisors from his home and at times from the storage unit, using primarily Team Messenger, and traveling throughout the sales district making stops at businesses to promote Defendant's tobacco products. His job was to get businesses in the district to order Defendant's products from wholesale distributers that would deliver the products to the businesses. He used P.O.S. materials to promote the products to the public and to the businesses for their sale to the public.

14. Mr. Hernandez was also responsible for making sure Defendant was compliant with a Court Order to prominently display health warnings about its products at the point-of-sale. He had to make sure P.O.S. materials with the health warnings, known as "corrective statements," were distributed and prominently displayed in retail stores to warn about the use of Defendant's tobacco products.

15. Mr. Hernandez was Defendant's only employee physically in the sales district.

16. On information and belief, Defendant hired Mr. Hernandez under a business model that establishes its presence in sales districts by hiring employees who live in the districts to 1) market its tobacco products and 2) monitor compliance with a Court order requiring prominent display of health warnings, known as "corrective statements," at the point of sale. These activities include the use of Defendant's point-of-sale (P.O.S.) materials for both promotional and compliance purposes. Defendant treats the employees' residences and its storage units as its places of business.

17. Defendant used Mr. Hernandez's residence and its storage unit in El Paso as places of its business in the sales district that includes El Paso, Texas.

18. At the time of his discharge, Mr. Hernandez was earning a salary of $80,016 per year plus bonuses and benefits. The benefits included medical, dental, vision, and life insurance coverage for himself and his family, his partner and their three children. He also had a 401K plan with the company matching his contributions up to a maximum of 6% of his annual salary. The benefits also included JTI Family Leave, which includes 20 weeks of paternity leave.

19. Mr. Robert Richardson, District Sales Manager, was Mr. Hernandez's direct supervisor except for the weeks he was on JTI Family Leave after the birth of his child. During Mr. Richardson's JTI Family Leave, Mr. Nikola Korac, Regional Sales Director, acted as Mr. Hernandez's supervisor.

20. In company emails or Team Messenger messages, Defendant recognized Mr. Hernandez' performance in getting stores to make repeated purchases of the company's products. In Teams Messenger messages and emails, Mr. Hernandez was recognized for doing a good job in El Paso without much help.

21. During Mr. Hernandez's employment, he kept the Defendant apprised of his scheduled service with the National Guard by orally notifying his supervisors and providing his supervisors and the Human Resources Department with copies of the 1st Battalion, 200th Infantry (Light)'s Fiscal Year 2024 and Fiscal Year 2025 Drill Dates.

22. The only services Mr. Hernandez performed for the National Guard during his employment was for the monthly drill dates that were mostly on weekends.

23. In or about August or September 2024, Mr. Hernandez notified his acting supervisor, Nikola Korac, both orally and in an email or Teams Messenger message that his partner was pregnant and that her due date was in February 2025.

24. On or about October 28, 2024, Mr. Hernandez notified his acting supervisor, Mr. Nikola Korac, both orally and in emails or Teams Messenger messages that he expected to be deployed by the National Guard in May 2025 and that it would be a long deployment. Mr. Korac responded with an email or Teams Messenger message expressing concern saying he would have to pull other people from their territories and get them to work in Mr. Hernandez's territory while he was deployed.

25. In or about October 2024, Mr. Hernandez followed up his oral notice to Mr. Korac with an email or Teams Messenger message attaching a copy of a Memorandum for Record dated September 4, 2024, which he had received from the National Guard. The subject of the Memorandum is "Fiscal Year 2025 Drill Dates for 1st Battalion, 200th Infantry (Light)," and it includes the dates Mr. Hernandez is obligated to perform his National Guard service. Mr. Hernandez

also sent the Memorandum by email or Teams Messenger to a human resources employee and later to Mr. Richardson.

26. On January 3, 2025, Mr. Hernandez sent an email or Teams Messenger message to Mr. Robert Richardson, his supervisor who had just returned to work from his own paternity leave. The email or Teams Messenger message stated, "This is my drill schedule and it's looking like I will be deploying in May," and had the drill schedule as an attachment.

27. On January 3, 2025, Mr. Hernandez's partner gave birth to their third child, a son.

28. On January 6, 2025, Mr. Hernandez sent an email or Teams Messenger message to Mr. Richardson, who had just returned from his own paternity leave, Mr. Korac, and Stephanie Hansen from Human Resources to notify them of the birth of his son, to request JTI Family Leave from January 6, 2025 to January 27, 2025 and all of April 2025 for the birth of his son, and to remind them of his upcoming nine-month deployment with the National Guard beginning in May 2025. He also asked for guidance on any additional steps the Defendant required him to take.

29. On January 6, 2025, Mr. Richardson confirmed he received Mr. Hernandez's January 6 email or Teams Messenger message in his email or Teams Messenger message of the same date stating,

> HR Stephanie Hansen
> And Satrio
>
> stephanie.hansen@jti.com
> iqbal.satrion@jti.com
>
> Your first block on paternity leave you would like to start from Jan 6th to Jan 27th.
>
> You are going to be deployed in May for 9 months.

30. Mr. Hernandez's notice of his obligation to perform National Guard service was for his deployment to the "Horn of Africa." The deployment focuses on security operations and regional

6

stability. The mission involves working alongside international partners to support peacekeeping efforts and deter threats in the region.

31. All of Defendant's permanent (full time, part time) employees, regardless of gender, are eligible for twenty total weeks of JTI Family Leave benefit upon the birth or adoption of a new child into their family, after six months of continued employment. The birth must occur while the parent is a permanent employee. Eligible employees are provided with twenty total weeks of JTI Family Leave paid at one hundred percent pay of their annual base salary (paid semi-monthly) triggered upon the formal notification of the birth or adoption of a child. The leave must be used and completed within one year of the birth or adoption of the child. Any leave not used within the one year is forfeited and no cash payment is made in lieu of leave time. The leave can be used consecutively as one total twenty week block or it can be split into two separate blocks of time with each block not spanning for less than four weeks.

32. Mr. Hernandez was eligible for the twenty weeks of JTI Family Leave after the birth of his son on January 3, 2025.

33. Mr. Hernandez also had a conversation with Defendant's Human Resources employee during which he again asked for the JTI Family Leave/Paternity Leave. The HR employee told Mr. Hernandez she was not authorizing the leave to begin on January 6, 2025. Mr. Hernandez responded saying he had to take time off from work, that his son had just been born and the birth was earlier than expected. The HR employee said he could begin the JTI Family/Paternity Leave only on the first day of a month and instead authorized Mr. Hernandez to use only five days of another form of leave from work.

34. After using the five days of authorized leave, Defendant required Mr. Hernandez to return to work. Mr. Hernandez returned and worked at his job until he began his JTI Family

Leave/Paternity Leave on February 1, 2025.

35. On receiving the "Initial Family Leave Application Form" from Ms. Stephanie Hansen, Human Resources, Mr. Hernandez complied with the oral instructions he had been given that his JTI Family Leave/Paternity Leave could only begin on the first day of the month, and filled out the paperwork to begin his first block of leave on February 1, 2025 and the second block of leave on April 2, 2025. On or about January 18, 2025, he submitted the document to Ms. Hansen.

36. On or about February 1, 2025, Mr. Hernandez began his first block of one month paid JTI Family Leave, four of the twenty paid weeks of paternity leave the Defendant gives its employees.

37. On or about February 21, 2025, while Mr. Hernandez was on JTI Family Leave, Ms. Renee Duszynski, Key Account Director, called him and left a message to call her back.

38. On February 25, 2025, Ms. Duszynski talked to Mr. Hernandez and discharged him from the Defendant's employment saying there was no room for him with the company.

39. On or about March 24, 2025, the Department of the Army, State of New Mexico, Department of Military Affairs, ordered Mr. Hernandez to report on May 15, 2025 for active duty at Fort Bliss as a member of his National Guard Reserve Component Unit in support of Counter Terror Exord - Africom for a period of 400 days.

40. On or about April 9, 2025, the Department of the Army, State of New Mexico, Department of Military Affairs, ordered Mr. Hernandez to report to Fort Bliss on May 14, 2025 for pre-mobilization training.

41. Mr. Hernandez reported for the training as ordered.

42. In or about May or June 2025, Mr. Hernandez was deployed to the Horn of Africa. He is presently in active duty there as a soldier in the National Guard.

43. The reason given to Mr. Hernandez for his discharge under the facts of this case does not avoid liability and is a pretext. On information and belief, the real reason for his discharge was discrimination against him because of his membership, service, and obligation to perform service in the United States National Guard, because he advised Defendant he would be deployed and then sought to use his JTI Family Leave for the birth of his son before his scheduled deployment, and to willfully violate the requirements of USERRA.

44. On information and belief, the Court Order requiring tobacco companies and retailers of tobacco products to prominently display health warnings, "corrective statements," at the point of sale expired on July 1, 2025. Defendant continued Mr. Hernandez's employment after that date.

45. On information and belief, Defendant replaced Mr. Hernandez with another individual, or other individuals, to market its tobacco products in the territory he had been covering.

46. In or about October 2024, Defendant's parent company, Japan Tobacco Inc. (JT Group) completed its acquisition of a business, a company and its subsidiaries, that had been marketing its tobacco products in the same markets Mr. Hernandez had been marketing Defendants' products.

47. On information and belief, the business that was acquired by Defendant had an individual, an employee or worker, marketing Liggett tobacco products to many of same retailers Mr. Hernandez was marketing Defendant's products. Mr. Hernandez became aware of the existence of this individual when he discovered from retailers the promotional materials and "corrective statements" he was distributing and displaying in retail stores for Defendant were being removed by the individual marketing Liggett tobacco products and displaying Ligget's corrective "statements." Mr. Hernandez reported to his supervisors what the retailers had told him.

48. On information and belief, Defendant replaced Mr. Hernandez by either hiring an individual, or individuals, to cover the territory he had been covering, or by turning over his territory

to an individual or individuals, who were part of the sales force of the acquired business.

49. After his employment was terminated Mr. Hernandez received an email from Defendant that included a document, "General Q&A" "Integration" "Updated February 26, 2025," that answered questions about how the acquisition of the business would affect the company and its employees. The document includes the following:

> **4) Are there any immediate changes to my individual responsibilities?**
>
> a) All sales personnel should continue to call on their current customers and territories during this next training phase that runs through the end of March.
>
> * * * * *
>
> **7) I am in a sales role. How will I carry/work with the different products of JTI and LVB?**
>
> a) Training will be provided to all regions/teams throughout March 2025 to build the teams, train on new system and ensure that employees are clear on their new responsibilities and territories. You will hear details from your Line Manager and the Sales Leadership Team.
>
> * * * * *
>
> **11) What brand will we focus the most on?**
>
> a) Our focus will be on maximizing both share and margins across our entire expanded portfolio.
>
> **12) How did we land on Synergy as the platform?**
>
> a) The platform was selected as it provided the best functionality to our newly combined sales force. By leveraging this platform, our sales representatives will have the tools needed to drive stronger performance and deliver even greater results across the organization.
>
> * * * * *
>
> **16) Why did you change the name from Business Advisor, Retail Account Manager or Sales Rep to Trade Marketing Representatives (TMR)?**
>
> a) During the integration process, we took the opportunity to evaluate positions against global benchmarks. The new designation of Trade Marketing Representative was chosen as it best reflects the roles responsibilities and strategic importance. District Manager are now Division Managers.

> 17) **How did you come up with the new regions and territories?**
>
>    a) When defining regions and territories, our goal was to create a balanced distribution across all geographic areas while considering market share and volume. Additionally, we strategically aligned our priority markets to ensure stronger focus in key states. These smaller well defined regions and territories will enable greater focus allowing us to accelerate growth more efficiently.

50. The Defendant's failure to comply with the provisions of The Uniformed Services Employment and Reemployment Rights Act of 1994 was willful. It knowingly failed to comply with USERRA.

51. As a proximate result of the Defendant's conduct, Mr. Hernandez has suffered and will in the future continue to suffer lost wages and benefits.

52. As a proximate result of Defendants' conduct, Mr. Hernandez has been compelled to hire an attorney and pay the attorney for legal services rendered and to be rendered in the preparation and trial of this case.

### VI. Claims

53. <u>USERRA Discrimination</u>: Mr. Hernandez's membership, service, and obligation to perform service in the United States National Guard was a motivating factor in Defendant's decisions to deny him the paternity leave benefits Defendant provides its employees, and to not retain him in its employment and to discharge him, in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994. See 38 U.S.C. §4311(a).

54. <u>USERRA Discrimination and Retaliation</u>: Mr. Hernandez's exercise of a right under USERRA, to preserve his entitlement to the reemployment rights and benefits and other employment benefits of USERRA by giving advance oral and written notice to Defendant that he would be absent from his position of employment by reason of his obligation to serve in the United States National Guard, was a motivating factor in Defendant's decision to discriminate by denying him the paternity

11

leave benefits provided to its other employees, and its decisions to not retain him in its employment and to discharge him, in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994. See 38 U.S.C. §4311(b)(4) and §4312(a).

## Prayer for Relief

Wherefore, Plaintiff respectfully requests that this Court cite the Defendant to answer and appear, and upon final trial enter a judgment upon his favor and award the following:

1. Declaratory, injunctive, and equitable relief pursuant to The Uniformed Services Employment and Reemployment Rights Act of 1994, USERRA, 38 U.S.C. §4323(e) including: a) reinstatement of the Plaintiff to the same position of employment, if he so elects, and b) expungement of employment records showing he was involuntarily terminated, and changing the records to show he resigned, if he so elects;

2. Lost wages, back pay, front pay, and lost benefits plus interest pursuant to The Uniformed Services Employment and Reemployment Rights Act of 1994, USERRA, 38 U.S.C. §4323(d)(1)(B) and §4323(d)(1)(C);

3. Liquidated damages in an amount that is the greater of $50,000 or the amount equal to the loss of wages or benefits plus interest (38 U.S.C. §4323(d)(1)(B) and §43(d)(1)(C)) pursuant to The Uniformed Services Employment and Reemployment Rights Act of 1994, USERRA, 38 U.S.C. §4323(d)(1)(D);

4. Costs, pursuant to The Uniformed Services Employment and Reemployment Rights Act of 1994, USERRA, 38 U.S.C. §4323(h) including expert witness fees and other litigation expenses;

5. Reasonable attorneys' fees, pursuant to The Uniformed Services Employment and Reemployment Rights Act of 1994, USERRA, 38 U.S.C. §4323(h);

6. Prejudgment and post-judgment interest as provided by law;

7. Such other and further relief to which Plaintiff may be entitled and as the court deems just, proper, and equitable.

### Jury Trial Demanded

Plaintiff demands trial by jury.

                                            Respectfully submitted,

                                            /s/ Perry Pinon
                                            PERRY PINON
                                            Attorney for Plaintiff
                                            State Bar No. 16016350
                                            1312 Montana Ave.
                                            El Paso, Texas   79902
                                            (915)  546-9190
                                            perrypinonatty@aol.com